**ALLOY INTERNATIONAL CO., a corporation, Plaintiff-Appellant,**

v.

**HOOVER–NSK BEARING COMPANY, INC., a corporation, and Hoover Ball & Bearing Company, a corporation, Defendant-Appellees.**

No. 78–2137.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 22, 1979.

Decided Jan. 22, 1980.

As Amended Feb. 8, 1980.

Rehearing Denied March 12, 1980.

Before PELL, Circuit Judge, VAN DU-SEN, Senior Circuit Judge,* and TONE, Circuit Judge.

TONE, Circuit Judge.

The evidence in this treble-damage action under § 1 of the Sherman Act, 15 U.S.C. § 1, would have permitted the jury to find that the defendant manufacturer refused to sell to the plaintiff distributor as a result of an agreement with the latter's competitor aimed at eliminating price competition between the distributors. The jury, however, returned a general verdict in favor of the defendant manufacturer. The principal issues presented by the parties are, first, whether such a refusal to sell would have been a *per se* violation of § 1, and, second, if so, whether the jury was adequately instructed to that effect. We accept plaintiff's view of the substantive law, but hold that the jury was adequately informed on that subject; we therefore affirm the judgment.

Only one claim is before us:[1] Plaintiff Alloy International Company, a distributor of bearings, alleges that defendant Hoover Ball & Bearing Company,[2] a manufacturer of bearings, refused to continue selling bearings to Alloy pursuant to the request of another Hoover distributor, Dodge & Seymour, Inc.,[3] a competitor of Alloy. Both the request and the refusal are alleged to have been for the purpose of eliminating price competition between Dodge & Seymour and Alloy in the resale of Hoover bearings. Alloy contends that the conduct of Hoover and Dodge & Seymour constituted a conspiracy to restrain price competition that was a *per se* violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

*The Facts*

Although the record is long, the essential facts may be stated briefly. Hoover sold bearings for export to Dodge & Seymour, for many years pursuant to an exclusive contract and later under a less formal relationship. Shortly before and after the termination of the exclusive contract, Hoover accepted and filled several orders from Alloy for bearings to be exported. Alloy concentrated its efforts to resell Hoover bearings in Southeast Asia, where Dodge & Seymour also sold.

Alloy's prices in Southeast Asia were lower than those of Dodge & Seymour. This led to complaints by Dodge & Seymour to Hoover that Alloy was "price cutting." Hoover, although it neither suggested nor

---

* The Honorable Francis L. Van Dusen, Senior Circuit Judge of the United States Court of Appeals for the Third Circuit, is sitting by designation.

1. Two other counts and a counterclaim were before the district court, but no error is alleged with respect to any of them. One of the other counts was also based on the antitrust laws; the second, a pendent count, alleged a claim under state common law. Both counts were dismissed during the trial. The trial court directed a verdict on the counterclaim for a sum due for goods sold and delivered.

2. Hoover Ball & Bearing's successor in the bearing business, Hoover-NSK Bearing Co., Inc., and the successor's Japanese parent company, Nippon Seiko, K.K., were named as defendants, the refusal to sell having continued after the succession. During trial Alloy dismissed all its claims against Nippon Seiko. There being no reason to distinguish between the two remaining defendants for purposes of deciding whether a new trial is required, they are both referred to herein as "Hoover."

3. Dodge & Seymour subsequently became XM World Trade, Inc., and still later became Drake America Corporation.

knew the prices at which its bearings were resold in Southeast Asia, disliked price cutting. Also, Hoover desired to raise its own prices and recognized that its ability to do so might well be influenced by the prices at which the bearings were resold abroad. Ultimately, Hoover refused to continue selling to Alloy.

The jury could properly have found either that, as Alloy contended, Hoover ceased selling to Alloy pursuant to an understanding with Dodge & Seymour entered into for the purpose of eliminating price competition between the two distributors, or that, as Hoover contended, it independently decided to cease selling to Alloy and, moreover, so decided for reasons other than the price cutting.

## I.

In challenging the judgment on the verdict, Alloy argues that if the refusal to sell was the result of an agreement between its competitor and Hoover to eliminate Alloy's price competition in Southeast Asia, the refusal was a *per se* violation of § 1 of the Sherman Act, and, further, that the trial court, when it refused a proper issue instruction to that effect tendered by plaintiff, failed adequately to instruct the jury. Hoover responds that its refusal to deal with Alloy, even if so motivated, was not a *per se* violation but must be tested by the rule of reason; concededly, plaintiff did not offer evidence that would have supported a determination in its favor if the rule of reason had applied. Alternatively, Hoover argues that, even if the law is as Alloy contends, the jury was adequately instructed despite the refusal of Alloy's issue instruction.[4]

4. Hoover also argues that the evidence was insufficient to make out a prima facie case on plaintiff's theory. As we have already indicated, the evidence was sufficient.

5. We refrain from characterizing what we say on the antitrust issue. There is authority for the position that it is not dictum:

It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the

Because we conclude, as explained below, that the jury was adequately instructed in accordance with plaintiff's *per se* theory, the fact that the jury nevertheless decided against plaintiff makes it possible for us to decide the case without deciding whether that theory is legally correct. Yet the orderly approach to deciding the case was to consider the substantive issue first. This was so not merely because the parties had argued the case in that sequence, but also because a resolution of the substantive legal issue in defendants' favor would have made it unnecessary to go on to consider the adequacy of the instructions, a task which required extensive examination of the record. Now, having proceeded in that sequence, and having accordingly formed an opinion on the substantive antitrust issue, it seems appropriate to express that opinion in order to report accurately the process by which we have reached our decision.[5]

The antitrust issue was recently decided by the Third Circuit in *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979), in which the court stated its holding as follows:

If Cernuto [the terminated distributor] can prove at trial that United [the manufacturer], Lappin [United's sales representative] and Famous [Cernuto's competitor] conspired to protect Famous from price competition by Cernuto, and that United and Lappin terminated Cernuto at Famous' request and in pursuit of a price related end, then it can prevail on a price-fixing theory notwithstanding its failure to show any impact on competition ....

*Id.* at 170. This was so even though the alleged conspirators "did not set prices at an exact level." *Id.* at 168–69. For, said Judge Adams for the court,

regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. *Florida Cent. R. R. v. Schutte*, 103 U.S. (13 Otto) 118, 143, 26 L.Ed. 327 (1881). It is at worst judicial dictum rather than *obiter dictum. See* R. Cross, *Precedent in English Law* 86 (2d ed. 1968) (quoted in R. Aldisert, *The Judicial Process* 798 (1976)); *see also United States v. Bell*, 524 F.2d 202, 205–06 (2d Cir. 1975).

If the purpose and effect of the challenged conduct is to restrain price movement and the free play of market forces, it is then illegal *per se.*

*Id.* at 169.

■ We believe that the *Cernuto* case was correctly decided and are in essential agreement with the reasoning of the opinion in that case.[6] For us, Hoover's arguments that the law is otherwise are sufficiently answered by that opinion. Accordingly, our premise in considering the instructions issue is that the verdict can stand only if the jury understood that, if they found Hoover refused to sell bearings to Alloy pursuant to an agreement entered into for the purpose of restricting price competition between Dodge & Seymour and Alloy, Hoover would be liable under § 1 of the Sherman Act.

## II.

We turn to the issue of whether the jury was adequately instructed. Usually, the jury is advised of the applicable substantive law and the ultimate issues it must decide in applying that law to the facts by an issues instruction specifying the elements of the plaintiff's claim and stating that, in order to prevail, the plaintiff has the burden of proving each of these elements.

■ Alloy tendered an instruction of this kind, which was refused by the judge, and thereafter repeatedly revised, retendered, and still refused. We believe the final version was a correct statement of the

law as we have declared it. As such it should have been given,[7] for a party is entitled to have the jury instructed on his theory of the case. Opening statements or closing arguments of counsel are not to be relied upon as a substitute for proper jury instructions.

■ Nevertheless, an error in refusing to give an instruction, like any other trial error, is subject to Rule 61, Fed.R.Civ.P. If it "does not affect the substantial rights of the parties," we are to disregard it.

■ To apply this test to a failure to give a proper instruction, we determine whether the jury was sufficiently informed, by the instructions the court did give and by other means, of the issues and its duty to decide them. Alleged errors in jury instructions are considered in the light, not only of the instructions as a whole, but of the allegations of the complaint, the opening statements, the evidence, and the closing arguments. *Beard v. Mitchell,* 604 F.2d 485, 497–98 (7th Cir. 1979); *Musgrave v. Union Carbide Corp.,* 493 F.2d 224, 231 (7th Cir. 1974); *see Coughlin v. Capitol Cement Co.,* 571 F.2d 290, 300 (5th Cir. 1978) (Tuttle, J.). We consider all that the jury heard and, "from the standpoint of the jury," *Troutman v. Southern Ry.,* 441 F.2d 586, 590 (5th Cir.) (Wisdom, J.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), decide "not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its

---

**6.** Certain statements in the opinion, standing alone, might be read as requiring only that the competing distributor be motivated by a desire to eliminate price competition. *See* 595 F.2d at 165, 168. The above-quoted statement of what the plaintiff was required to prove, however, shows that the court was holding that the supplier also must be price motivated, if liability is to attach. A unilateral purpose held by only one party to the agreement would not seem to meet that element of § 1 which requires an agreement of two or more persons.

**7.** The only flaw in this instruction counsel for defendants could point to in oral argument before us was the reference to an agreement "between one or both defendants and Dodge & Seymour," which counsel said was inappropri-

ate because Hoover NSK, the successor to Hoover Ball & Bearing, was not yet in existence at the time of the refusal to deal with Alloy. Assuming this to be so, although Hoover NSK presumably succeeded to its predecessor's liabilities and in any event continued the refusal to deal, any error could have been corrected by changing a few words. The fact that counsel did not tender perfect instructions does not immunize from scrutiny on appeal a failure to instruct the jury adequately concerning the issues in the case. *Florists' Nationwide Telephone Delivery Network v. Florists' Telegraph Delivery Ass'n,* 371 F.2d 263, 270 (7th Cir. 1967); *Celanese Corp. v. Vandalia Warehouse Corp.,* 424 F.2d 1176, 1181 (7th Cir. 1970).

duty to determine those issues." *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1100 (5th Cir. 1973) (Wisdom, J.), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). Thus, in the recent *Beard* case, *supra*, even though the trial court rejected proper, specific instructions tendered by the plaintiff and instead used others that were "not entirely explicit," we nevertheless refused to reverse a judgment on the verdict for defendant, stating,

> Counsel's statements in open court, colloquies with the judge, opening and closing arguments and hours of witness testimony on the topic fully exposed the jury to plaintiff's theories. Unless there is substantial reason to believe that the jury did not recognize that it was entitled to find liability on the basis of certain facts in evidence we would be extremely reluctant to reverse.

*Beard v. Mitchell, supra*, 604 F.2d at 498.

In the case at bar the record, considered as a whole, shows that the jury was adequately informed of the disputed controlling issue and the applicable law. That issue was, why did Hoover stop selling to Alloy? That issue and the fact that it was controlling were made clear in opening statements, throughout the evidence, and in closing arguments. The portions of the closing arguments dealing with liability focused only on that issue. Counsel for Alloy argued that the reason for the refusal to sell was an agreement between Dodge & Seymour and Hoover aimed at the elimination of Alloy's price cutting, and counsel for Hoover responded that there was no such agreement and that Hoover alone decided, for reasons other than price cutting, to stop selling to Alloy.

■ In view of the foregoing, the lack of explicitness in the instructions was not reversible error. The judge summarized Alloy's claim, as stated in the complaint, in the following words:

> The plaintiff Alloy claims that Hoover and the unnamed alleged co-conspirator,

Dodge & Seymour, conspired to fix, maintain and stabilize the resale price of Hoover bearings exported to foreign countries, and that in furtherance of that conspiracy they agreed that Hoover would refuse to deal with Alloy and to fill any further orders from Alloy, including orders already procured by Alloy, all in violation of Section 1 of the Sherman Act, which is one of the antitrust laws.

He stated further,

> If you find that Hoover acted alone in deciding not to do further business with Alloy because it believed it would better serve its interest by reaching the overseas markets by other means, or because of the non-payment of box charges,[8] or for any other reason or combination of reasons, you must find Hoover not guilty.

He also stated,

> The mere fact that there may be ... business justifications for the restraining of price competition, or the fact that the resulting prices may be reasonable, will not relieve the members of a combination or conspiracy that restrains price competition from liability under the antitrust laws.
>
> Therefore, if you find that the defendants intended by their agreement to restrain price competition, the agreement is illegal, regardless of any other business justifications the defendants might offer.

The instructions thus informed the jury that Hoover was liable under the antitrust laws if it ceased selling to Alloy pursuant to an agreement made to restrain price competition. The only price competition referred to in the record and addressed in the closing arguments was that between Alloy and Dodge & Seymour. The jury could not have failed to understand that if the reason for the refusal to deal was as Alloy contended, then Hoover would be liable.

■ Alloy complains that, in summarizing its claim, the judge should not have used the word "fix," even though that word

---

8. Hoover contended that Alloy's resistance to paying for boxes in which the bearings were packed was one of the circumstances that prompted its decision to stop dealing with Alloy.

appears in its complaint,[9] because the jury may have understood that the alleged agreement was unlawful only if Hoover and Dodge & Seymour agreed on an exact resale price. It is most unlikely that the jury would have so understood. Alloy did not contend that Hoover and Dodge & Seymour had agreed on an exact price. Hoover's counsel did not argue to the jury that "fix" had such a meaning. Moreover, this instruction must be read with the later instruction stating that an "agreement to restrain price competition" would be illegal. As we said in *Dreckman v. Flores*, 331 F.2d 221, 222 (7th Cir. 1964) (quoting *Reivitz v. Chicago Rapid Transit Co.*, 327 Ill. 207, 213, 158 N.E. 380, 382–83 (1927)):

> The test, then, is not what meaning the ingenuity of counsel can at leisure attribute to the instructions, but how and in what sense, under the evidence before them and the circumstances of the trial, ordinary men acting as jurors will understand the instructions.

The same observation is applicable to another Alloy argument, *viz.*, that the summary of the claim should have omitted the phrase "including orders already procured by Alloy." The evidence showed that, after announcing the refusal to sell, Hoover did fill some of the Alloy orders that it had received before the announcement. Alloy argues that the jury might have thought this was fatal to its claim. It is at least doubtful that the jury would have understood that "orders already procured by" Alloy meant "all orders already received from" Alloy. Even assuming it did, the instructions as a whole and the absence from the record of any argument by Hoover that arguably exploited the possibility of the feared misunderstanding make it unlikely that the jury was misled.

Alloy also complains of a series of instructions stating that each of various described acts would not "without more" be unlawful and stating various rights of Hoover and Dodge & Seymour. These instructions, considered individually, are not inac-

curate, but Alloy argues that they are slanted in Hoover's favor and, taken together, were likely to mislead the jury. We think they were not prejudicial, considering all of the instructions in the light of the remainder of the record.

That the instructions are not a model for future cases is not a reason to require a new trial when the record as a whole shows that the jury must have understood what issues it was supposed to decide and what verdict to return based on its determination of those issues. Inasmuch as no substantial right of plaintiff was affected by any defects in the instructions, the judgment must be affirmed. *See* Fed.R. Civ.P. 61.

AFFIRMED.

---

**9.** Alloy asserts that, although the word it complains of was in its amended complaint, a motion to amend that pleading, made during the instruction conference, to omit this word and the phrase discussed in the next paragraph of the text, was erroneously denied by the judge. Any error was harmless, for the reasons stated in the text.